**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **3:18-CR-279** |
| | : | **(JUDGE MARIANI)** |
| **MICHAEL RINALDI,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On August 21, 2018, a federal Grand Jury charged Defendants Michael Rinaldi, Dwayne Brown, and Andrew Henry with one count of Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, cocaine and cocaine base, in violation of 21 U.S.C. §§ 841 and 846.  (*See* Doc. 37). Defendants Brown and Henry thereafter signed plea agreements and entered guilty pleas before this Court in January, 2020.

On January 21, 2020, the Government filed a First Superseding Indictment in this action, charging Michael Rinaldi with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, specifically cocaine, cocaine base, heroin, and marijuana, in violation of 21 U.S.C. §§ 841 and 846 (Count 1) and with Distribution and Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841 (Count 2).  (*See* Doc. 220).

An eight-day jury trial was held beginning August 17, 2020.  On August 26, 2020, the jury returned a verdict finding Defendant Rinaldi guilty on Count 1 of Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, specifically heroin,

and guilty on Count 2 of Distribution and Possession with Intent to Distribute Cocaine. (Doc. 397).  The jury did not find Defendant Rinaldi guilty in Count 1 with respect to the controlled substances of cocaine, cocaine base, or marijuana.  Following the jury's verdict, the second phase of trial was held to address whether the property alleged in Count 1 and Count 2 of the First Superseding Indictment was subject to forfeiture by Defendant to the United States and whether Defendant Rinaldi, prior to having committed the offenses charged in the First Superseding Indictment, had a final conviction for a serious drug felony. The jury returned a verdict answering these questions in the affirmative.  (Doc. 399).

Now before the Court are Defendant Rinaldi's "Motion for a New Trial" (Doc. 402) and "Motion for Judgement of Acquittal" (Doc. 403).  For the reasons set forth below, the Court will deny the Defendant's motions in their entirety.

## II.  STANDARD OF REVIEW

A defendant may move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  Where "the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2).

> In  ruling  on  a  motion for judgment of acquittal made  pursuant  to Fed.R.Crim.P. 29, a district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilty beyond a reasonable doubt based on the available evidence.'" *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe,* 245 F.3d 257, 262 (3d Cir. 2001)). A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'" *Smith,* 294 F.3d at 477 (quoting *United States v. Leon,* 739 F.2d 885, 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and

assigning weight to the evidence, or by substituting its judgment for that of the jury. *See United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir.) (en banc) (trial court usurped jury function by deciding contested issues of fact), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also* 2A Charles A. Wright, FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury.").

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  The Third Circuit has long advised that, in considering a post-verdict judgment of acquittal, the court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt."  *United States v. Fattah*, 914 F.3d 112, 183 (3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)).  In *United States v. Tyler*, the Third Circuit again recently reiterated the well-recognized standard:

> This review is "highly deferential" to the factual findings of the jury, and we "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (alteration and omission in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

> Thus, even if the evidence adduced is consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict ... as long as it passes the bare rationality test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that [t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. It is up to the jury – not the district court judge or our Court – to examine the evidence and

draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

*Id.* at 433 (alteration in original) (internal quotation marks and citation omitted).

956 F.3d 116, 122-123 (3d Cir. 2020).

A defendant may also move for a new trial pursuant to Federal Rule of Criminal Procedure 33.  Rule 33 provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . ." Fed. R. Crim. P. 33(a).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions are not favored and should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

*United States v. Silveus*, 542 F.3d 993, 1004-1005 (3d Cir. 2008).  "The discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated."  *United States v. Smith*, 139 F.App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993)).  Where a defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the

4

trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

### III. ANALYSIS

On September 10, 2020, Defendant Rinaldi filed a "Motion for a New Trial" (Doc. 402) and "Motion for Judgement of Acquittal" (Doc. 403). The Court will address these motions in turn.

### A. Motion for Judgment of Acquittal

Defendant Rinaldi's motion for judgment of acquittal requests acquittal only as to Count 1 of the Indictment and does not challenge the jury's verdict as to Count 2. (*See generally*, Doc. 403).

The Third Circuit has specifically addressed the "appropriate standard to apply to reviewing a sufficiency of the evidence challenge in drug conspiracy cases." The Circuit has explained that, as in any other criminal case, "[t]he district court . . . [is] not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not fall below the threshold of bare rationality." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013)(internal quotation marks omitted).

> While evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict – and not to usurp the role of the jury – as long as it passes the "bare rationality" test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that "'[t]he evidence does not

need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt.'" *United States v. Cooper,* 567 F.2d 252, 254 (3d Cir. 1977) (quoting *United States v. Allard,* 240 F.2d 840, 841 (3d Cir. 1957)).  It is up to the jury – not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld. In our role as reviewers, we must resist the urge to hypothetically insert ourselves into the jury room for deliberations.

*Caraballo-Rodriguez*, 726 F.3d at 432.

In support of his motion, Rinaldi first asserts that the jury's verdict on Count 1, finding Defendant guilty of Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, specifically heroin,[1] "was against the weight of the evidence and was premised on the erroneous theory that Rinaldi conspired with Christopher Peterson who was a paid DEA confidential source."  (Doc. 403, at 1-2).

Here, reviewing the record in the light most favorable to the prosecution, the evidence of record at trial was sufficient for a rational trier of fact to have found proof of guilt beyond a reasonable doubt as to Rinaldi's conviction for conspiracy to distribute and possess with intent to distribute a controlled substance, specifically heroin.

First, the jury's verdict is supported by the testimony of Dwayne Brown and Andrew Henry, both of whom testified that they engaged in a conspiracy to distribute controlled substances with Rinaldi.

---

[1] Although Rinaldi was charged in the First Superseding Indictment with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, specifically cocaine, cocaine base, heroin, and marijuana, in response to the jury interrogatory, the jury only found Rinaldi guilty of this offense with respect to heroin.  (*See* Doc. 397, at 2).

With respect to the heroin, Dwayne Brown testified that he and Rinaldi "tried the heroin thing for a while, but it didn't work so." (Trial Tr., Aug. 18, 2020, at 78). Brown stated that he obtained heroin "three or four" times, and that he would purchase the heroin in "bricks", each of which consisted of approximately 50 bags of heroin. (*Id*. at 78-79). Brown stated that he obtained approximately "five or ten" bricks, *i.e.* 250 to 500 bags, at a time. (*Id*. at 79). Brown also testified that he and Rinaldi would both sell the heroin and had an understanding of how any profits would be shared. (*Id*. at 80). Brown testified that he and Rinaldi ("we") bought the heroin for $200 or $250. (*Id.* at 116).

In addition, Andrew Henry testified that Rinaldi sold "[c]oke, weed, crack" and, at a later time, heroin, and that he sold drugs for Rinaldi. (Trial Tr., Aug. 19, 2020, at 17-18; *see also, id.* at 20-21 (stating he sold and delivered "[c]ocaine, crack, weed, [and] heroin" for Rinaldi")). With respect to the heroin, Henry testified that he sold it in small bags, and would sell it by the bag or in quantities of fifty bags (a "brick") at once. (*Id.* at 24-25). Henry testified that he drove Rinaldi "[a] few times" to the home of a woman who lived on "Hancock Street" and Rinaldi sold her heroin. (*Id.* at 109-110). Henry further stated that Rinaldi obtained both the heroin and cocaine from Philadelphia and that Brown would drive there to get these substances. (*Id.* at 32-33). According to Henry, the heroin that Brown got

in Philadelphia was in powder form.  (*Id.* at 38).  The heroin usually came from Philadelphia

in small bags but needed to be bagged one time by Henry, Brown, and Rinaldi. (*Id.* at 39).[2]

The jury's verdict with respect to the conspiracy to distribute and possess with intent

to distribute a controlled substance is further supported by the testimony of William Langan

and Thomas Kaluzny.  Langan, an agent with the Department of Justice Drug Enforcement

Administration, testified that he and his Task Force Officer, Thomas Kaluzny, conducted a

controlled buy on May 14, 2018, with the intention of purchasing 20 grams of heroin for

$1050.  (Trial Tr., Aug. 20, 2020, at 33, 34).  Langan's confidential source for the controlled

purchase was Christopher Peterson. (*Id.* at 34).  According to Langan, that day, he and

Kaluzny, through Peterson, "placed a phone call to [Steven] Powell to set up the 20-gram

heroin buy."  (*Id.* at 34-35).  Although Peterson spoke with Powell and was told to go to the

Wyoming Valley Mall, Peterson was later told to go to U.S. Gas service station in Wilkes-

Barre.  (*Id.* at 38-39).  At the gas station, Peterson met with, at that time, an unidentified

---

[2] At trial, both Brown and Henry testified that they had entered into plea agreements with the Government and pleaded guilty to engaging in a conspiracy with Rinaldi.  Brown testified that he was being prosecuted by the U.S. Attorney's Office, with Michael Rinaldi and Andrew Henry, for conspiracy and that he was "dealing" "cocaine, crack cocaine and heroin."  (Trial Tr., Aug. 18, 2020, at 53-54). Henry also testified that he pleaded guilty to conspiracy to distribute and possess with intent to distribute cocaine and cocaine base.  (Trial Tr., Aug. 19, 2020, at 7-8).  Upon review of his plea agreement, Henry further agreed that he was responsible for "cocaine, crack base, and heroin" and admitted that he also dealt marijuana.  (*Id.* at 9).
  The jury was instructed that the guilty pleas of Brown and Henry were "evidence . . . offered only to allow you to assess the credibility of the witness, to eliminate any concern that Mr. Rinaldi has been singled out for prosecution; and to explain how Mr. Brown and Mr. Henry came to possess detailed first-hand knowledge of the events about which they testified."  (Trial Tr., Aug. 24, 2020, at 126; Doc. 394, at 10). The jury was cautioned that it "must not consider the guilty pleas of Dwayne Brown and Andrew Henry as any evidence of Michael Rinaldi's guilt [and that] Mr. Brown and Mr. Henry's decisions to plead guilty were personal decisions about their own guilt."  (Trial Tr., Aug. 24, 2020, at 126; Doc. 394, at 10).

individual (*id.* at 40-41), and testimony was later offered to establish this individual was

Rinaldi (*id.* at 155-156) ((Kaluzny identifying Rinaldi as individual who arrived at U.S. Gas

and met with Peterson)).

Kaluzny corroborated Langan's testimony, repeatedly testifying that he and the task

force "set up a controlled purchase of controlled substance", specifically 20 grams of heroin,

which Peterson would buy from Powell.  (Trial Tr., Aug. 20, 2020, at 81, 88, 140, 144, 150,

157).  Although Peterson was ultimately unsuccessful in purchasing heroin that day,

Kaluzny testified that he again utilized Peterson to attempt to buy 10 grams of heroin from

Rinaldi.  (*Id.* at 171, 179).

On direct examination of Kaluzny, a number of exhibits were admitted into evidence

to support Langan and Kaluzny's testimony.  The jury viewed a video and audio of the

controlled purchase which occurred on May 14, 2018 between Peterson and Rinaldi.[3]  (Gov.

Ex. 11.1).  During this video, Rinaldi informed Peterson that he could get him "diesel"[4]

probably the next day, that he had to make a "trip" to get it but could get it to Peterson "raw"

if Peterson wanted it.  Rinaldi quoted Peterson a price of $85/gram and told him to call him

the next day.  (*Id.*).  In a recorded call from Peterson to Powell later that same day,

---

[3] The jury convicted Rinaldi of distribution and possession with intent to distribute cocaine in Count 2 of the Superseding Indictment, which charged that the violation occurred "on or about May 11, 2018" (Doc. 220).  No other evidence of a specific transaction involving cocaine in May, 2018, was presented to the jury.  Thus, although Rinaldi has previously denied that he is the individual in this video of May 14, 2018, the jury found beyond a reasonable doubt that he was the person who sold the cocaine to Peterson.

[4] Task Force Officer Kaluzny defined the word "diesel" as one term for heroin.  (Trial Tr., Aug. 20, 2020, at 77).

Peterson told Powell that "he", referring to Rinaldi, "said he had, he can get the other joint for 85 . . . so he's gonna let me know".  (Gov. Ex. 9).  In response, Powell stated that "that's probably something . . . he would know that".  (*Id*.).  The jury further heard a recorded conversation between Peterson and Rinaldi from May 22, 2018.  (Gov. Ex. 12).  In that call, Rinaldi confirmed that $85 was "their best number" and, upon confirmation by Peterson that he wanted the substance, that he would have his "man send it".  Rinaldi repeatedly referred to an unidentified man ("he") throughout the conversation who Rinaldi was going to see and who would provide him with the substance.  (*Id*.).  (*See also* Gov. Ex. 36 (text dated May 24, 2018 from Rinaldi to Peterson saying that his "homey said he won't have that till sat or sun"); Gov. Ex. 37 (text dated June 5, 2018 from Rinaldi to Peterson saying that he "got that other thing you ask me for last week")).  A recorded telephone conversation from June 6, 2018, between Peterson and Rinaldi was also admitted into evidence.  (Gov. Ex. 35).  In that call, Rinaldi informed Peterson that "Bones"[5] got "some of it".  Throughout the conversation, Rinaldi again referred to another male individual who had provided him with the substance, informed Peterson that $75 was a good price, and that this individual's "girl" was supposed to show Rinaldi how to use the substance. (*Id*.).

In light of the afore-stated testimony and evidence of record, it is clear that the verdict was not "against the weight of the evidence" as Rinaldi claims (Doc. 403, at 1-2) and that the jury's conclusion that Rinaldi engaged in a conspiracy to distribute and possess with

---

[5] Dwayne Brown testified that his street name was "Bones."  (Trial Tr., Aug. 18, 2020, at 52).

intent to distribute a controlled substance, specifically heroin, was not "irrational" such that it cannot be upheld, *Caraballo-Rodriguez*, 726 F.3d at 432.

Rinaldi claims that the jury "rejected the testimony of Dwayne Brown, Andrew Henry, Jessica Caldwell and George Kokenyei and this is reflected in the verdict" because he was not convicted of conspiracy to distribute cocaine or marijuana. (Doc. 403, at 3). Rinaldi posits that "the only evidence of an agreement to possess with intent to distribute heroin is a phone call between Rinaldi and Christopher Peterson [on June 6, 2018]" and concludes that "the only logical inference is that Rinaldi was convicted of conspiring with Christopher Peterson" and that he "cannot legally conspire with a government informant." (*Id.* at 3, 4; *see also*, *id.* at 2 (asserting that verdict was "premised on the erroneous theory that Rinaldi conspired with Christopher Peterson who was a paid DEA confidential source.")).

Preliminarily, Rinaldi is incorrect that "the phone call" was the only evidence of a conspiracy involving heroin. Rather, in addition to the June 6, 2018 "phone call" between Rinaldi and Peterson, as more extensively set forth, *supra*, both Brown and Henry testified that they both sold heroin, as did Rinaldi, shared the same supply with Rinaldi, and explained how the heroin, and the profits from any sales, were shared. Additionally, a number of recorded conversations and text messages referencing heroin were entered into evidence, some of which mentioned an unidentified male who was supplying Rinaldi with heroin and one of which mentioned Brown, as was the video and audio recording of the May

14, 2018 controlled purchase wherein Rinaldi stated he could get heroin for Peterson and could have his "man" send it.

Nor is Rinaldi correct in asserting that he was convicted of conspiring with Christopher Peterson. Simply because there was testimony and evidence presented as to Peterson and Rinaldi's conversations with respect to heroin, this does not mean that the jury found that Peterson conspired with Rinaldi.  The conversations only provided additional evidence which the jury could consider in determining whether a conspiracy exited.  Rather, the testimony and evidence presented at trial, as set forth *supra*, could lead a reasonable trier of fact to find beyond a reasonable doubt that a number of individuals were directly involved in a conspiracy with Rinaldi to distribute and possess with intent to distribute the controlled substance of heroin.  A jury could also have reasonably believed that Peterson was merely a buyer and was not involved in any conspiracy.

Furthermore, Defendant's argument as to what testimony the jury believed or relied upon in reaching its verdict, and specifically that the jury necessarily rejected the entire testimony of Brown, Henry, Caldwell, and Kokenyei, is entirely speculative.  The jurors were tasked with determining the credibility of each witness and were entitled to give that witness' testimony whatever weight they felt it deserved.  In determining each witness' credibility, the jury was not required to either wholly reject or accept the witness' testimony, but rather was entitled to accept any parts of the testimony that it believed and give that testimony any weight it thought the testimony deserved.  *See e.g., United States v. Boone*, 279 F.3d 163,

189 (3d Cir. 2002) ("A jury is free to believe part of a witness' testimony and disbelieve another part of it.").  Where there was sufficient evidence presented at trial to support the jury's determination as to Rinaldi's guilt beyond a reasonable doubt with respect to a conspiracy to distribute and possess with intent to distribute the controlled substance of heroin, it is not for the defendant, or this Court, to speculate as to the credibility determinations made by the jury or why the jury did not also find Defendant guilty of conspiracy as to the other named controlled substances.  Instead, the Third Circuit has cautioned that:

> . . . as the Supreme Court has articulated, a verdict on one count that seems to be at odds with another "shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *United States v. Powell*, 469 U.S. 57, 63, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932)). It is impossible to know in such cases whether the verdicts were an exercise of lenity by the jury or outright error.

> Nonetheless, as the *Powell* Court noted, any assessment of the jury's rationale for its verdicts "would be based either on pure speculation or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* at 58, 105 S.Ct. 471.

*United States v. Hird*, 913 F.3d 332, 352-353 (3d Cir. 2019).  *See also*, *Powell*, 469 U.S. at 67 ("Courts have always resisted inquiring into a jury's thought processes . . . ; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.").

Defendant further asserts that "at most the evidence showed two different conspiracies" – "[o]ne involving Dwayne Brown, Andrew Henry, and Michael Rinaldi" for distribution of "cocaine, cocaine base, and heroin," and a second "involving Steven Powell, Jessica Caldwell, George Kokenyei and Michael Rinaldi" for distribution of "cocaine and marijuana". (Doc. 403, at 2).[6]  Rinaldi argues that the "record is totally devoid of any evidence that these two conspiracies were at any time one overall agreement."  (*Id.* at 3).

As the Third Circuit explained in *United States v. Kelly*, "[w]here a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies."  892 F.2d 255, 258 (3d Cir. 1989).  Multiple conspiracies consist of "'separate networks operating independently of each other.'"  *United States v. Perez*, 280 F.3d 318, 346 (3d Cir. 2002) (quoting *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992)).  The issue of whether a single conspiracy or multiple conspiracies exist is a question of fact for the jury to decide.  *Perez*, 280 F.3d at 345.  Although a jury can only convict "if the government proved the single conspiracy charged in the indictment and not some other separate conspiracy", "even 'a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not

---

[6] At the close of the Government's case at trial, Rinaldi moved for judgment of acquittal, arguing that the two separate conspiracies were (1) distribution of cocaine, cocaine base, and heroin with Henry and Brown, and (2) distribution of marijuana with Caldwell, Kokenyei, and Powell.  (*See* Trial Tr., Aug. 21, 2020, at 113).  It is unclear if Rinaldi's current motion for judgment of acquittal, asserting that the second conspiracy was for distribution of "cocaine and marijuana" is an error or if Rinaldi has changed his position as to the nature of the asserted second conspiracy.

create an impermissible variance.'"  *Kelly*, 892 F.2d at 258 (quoting *United States v. Smith*,

789 F.2d 196, 200 (3d Cir. 1986)).

> The essence of a conspiracy is an agreement. The government need only prove that the defendant agreed with at least one of the persons named in the indictment that they or one of them would perform an unlawful act. Failing to prove that all named co-conspirators conspired with the defendant is not fatal to the government's case.

*Id.* at 258-259 (internal citation omitted).

Courts should "employ a three-step inquiry to determine whether a series of events

constitutes a single conspiracy or separate and unrelated conspiracies."  *Id.* at 259.

> First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators.  Third, we examine the extent to which the participants overlap in the various dealings.

*Id.* (internal citations and quotation marks omitted).  While "the *Kelly* factors are most useful

to show the existence of a single conspiracy, . . . the absence of one factor does not

necessarily defeat an inference of the existence of a single conspiracy."  *United States v.

Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

Here, Rinaldi was charged in Count 1 of the First Superseding Indictment with

"Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances",

alleging a conspiracy "with other persons both known and unknown to the grand jury" to

distribute cocaine, cocaine base, heroin, and marijuana.  (Doc. 220).

Although Rinaldi asserts that at trial, "at most the evidence showed two different conspiracies" and that the "record is totally devoid of any evidence that these two conspiracies were at any time one overall agreement" (Doc. 403, at 2, 3), reviewing the record in the light most favorable to the prosecution, a reasonable jury could find the existence of a single conspiracy to distribute controlled substances.

Rinaldi contends that one alleged conspiracy involved the distribution and possession with intent to distribute cocaine, cocaine base, and heroin by Rinaldi, Brown, and Henry, and the other alleged conspiracy involved the distribution and possession with intent to distribute marijuana (and possibly cocaine). (Doc. 403, at 2). Despite this claim, evidence was presented a trial which a reasonable jury could find demonstrated one common agreement to sell the controlled substances.

Rinaldi's argument is premised on an assertion that there was no overlap between the controlled substances of cocaine, cocaine base, and heroin with the marijuana, and no overlap between the alleged participants in the sale of these two allegedly separate conspiracies to sell these controlled substances. This argument is without merit and ignores the record evidence.

As detailed above, at trial both Brown and Henry testified that they sold cocaine and heroin with Rinaldi. Henry further testified that he also sold marijuana for Rinaldi, which he knew was provided by, at that time, an unidentified woman. Specifically, Henry testified that he saw Rinaldi getting the "weed" from a "[s]hort, chubby" female. (Trial Tr. Aug. 19, 2020,

16

at 28).  Henry identified this woman by her photograph shown to him at trial (*id*. at 29), and

that photograph was later identified as Jessica Caldwell (Trial Tr. Aug. 20, 2020, at 7, Gov.

Ex. 27).  Henry stated that "[s]he used to bring weed" in a suitcase and that it was "[a] lot."

(Trial Tr. Aug. 19, 2020, at 30-31).  According to Henry, Rinaldi told him about her, including

that Rinaldi "got to pay her for [the weed]", and called her "the weed lady".  (*Id*. at 31).  In

turn, Caldwell testified that upon deciding to sell marijuana, she contacted Steven Powell.

(Trial Tr. Aug. 19, 2020, at 182-183).  She believed Powell "would know somebody that

could help [her]" and Powell gave her Rinaldi's contact information.  (*Id*. at 183). Caldwell

testified that she "sometimes" spoke with Powell about how much marijuana she was going

to sell.  (*Id.* at 183).  Caldwell testified that she would drive to Pennsylvania from New York

to meet with Rinaldi.  (*Id.* at 184-185).  Similarly, Kokenyei testified that he met with Rinaldi

in Pennsylvania "two or three times" to pick up money Rinaldi owed Caldwell and delivered

marijuana to Rinaldi on one occasion.  (Trial Tr. Aug. 20, 2020, at 12, 13-14).  Kokenyei

further testified that he also met with Powell once and gave him a bag of marijuana.  (*Id.* at

12-13).  In addition, as set forth *supra*, recorded conversations between (1) Powell and

Peterson, and (2) Rinaldi and Peterson, reflect that Powell set up the initial sale of a

controlled substance to Peterson, sent Rinaldi to meet with Peterson to sell him cocaine,

and told Peterson that Rinaldi "would know" about obtaining heroin.

There is no requirement, as Rinaldi appears to suggest, that every participant in the

alleged conspiracy personally knew each other or sold each of the controlled substances

alleged in the First Superseding Indictment.  At best, Rinaldi has shown the *possibility* that

the evidence could have demonstrated the existence of sub-schemes within a single

conspiracy, a finding which does not negate the existence of a single conspiracy.  Rather,

the testimony and evidence presented at trial were sufficient to demonstrate a common goal

among the conspirators, i.e. the sale of controlled substances, that the participants in the

two separate conspiracies alleged by Rinaldi actually overlapped to a significant extent, and

that the actions of the alleged co-conspirators were interrelated and overlapped to such an

extent that they furthered the common goal and ensured a continuous result that would not

have been maintained without the cooperation of the alleged conspirators.  Merely because

certain alleged members of the conspiracy were not directly involved with all of the

substances alleged or did not all personally know each other, does not negate a finding by

the jury that there was a unity of purpose and an agreement sufficient for a determination of

guilt beyond a reasonable doubt.

For each of the afore-discussed reasons, Rinaldi's "Motion for Judgement of

Acquittal" (Doc. 403) will be denied.

## B. Motion for New Trial

Rinaldi also moves for a new trial (Doc. 402) on both counts of the First Superseding

Indictment, asserting a number of issues as the basis for his motion.

### 1. <u>Jury Selection and Voir Dire</u>

Rinaldi first argues that "during jury selection and voir dire process that the Court was closed to the public and this was a violation of Rinaldi's rights." (Doc. 402, at 1).

On the first day of trial, August 17, 2020, the courtroom was arranged for jury selection, taking into account the necessary precautions in light of the COVID-19 pandemic. For purposes of conducting voir dire and jury selection, the benches where prospective jurors and members of the public normally sit were removed and replaced with chairs which were each situated several feet apart from one another. Due to the number of prospective jurors and the need for social distancing, those chairs, situated behind the Government and Defendant's tables, were reserved for the prospective jurors. However, chairs were placed to the side of the courtroom near the entryway and closer to the front of the courtroom which were available to the public or any court personnel present in the courtroom.

Prior to commencing trial proceedings on August 17, 2020, the Court informed counsel and Defendant of the manner in which voir dire and jury selection would proceed in light of the COVID-19 pandemic and the need to implement practices and protections to ensure that the courtroom was a "safe environment for everyone" and to ensure that social distancing was properly implemented. (Doc. 438, Tr. of Proceedings, Aug. 17, 2020, at 2). The Court explained that there was a panel of 91 prospective jurors, but that "because the benches have been taken out and the chairs have been socially-distanced for the purpose of protection of the prospective jurors", voir dire would be conducted on a "30-person basis."

(*Id*. at 2, 3).  The Court suggested to the parties that when the first group of prospective jurors was brought into the courtroom, they could "turn their chairs around and face the jury, because they'll be sitting behind you in those chairs."  (*Id*. at 3).  At no point in time did the Court state, or imply in any way, that the courtroom was, or would be, closed to the public or that the chairs to the side of the courtroom, which were specifically in excess of those needed for the prospective jurors, could not be used by any member of the public or person who so chose. No party inquired or requested clarification as to whether the courtroom would be open to the public or whether there would be any limitation on the number of members of the public who would be allowed into the courtroom at any given time.  At no time during the voir dire process or jury selection process did Defendant Rinaldi, his stand-by counsel, the Government, or any other person, inform the Court of a belief that certain individuals were being denied entry to the courtroom.  Rather, this Court observed several people who were not prospective jurors periodically come in and out of the courtroom and sit in the chairs on the side of the courtroom during this process.

The Sixth Amendment right "to a speedy and public trial", extends to the jury voir dire process and "the accused does have a right to insist that the *voir dire* of the jurors be public", subject to certain exceptions.  *Presley v. Georgia*, 558 U.S. 209, 213 (2010).

> In general, the denial of a defendant's right to a public trial is a "structural error" - i.e. a defect "affecting the framework within which the trial proceeds"- requiring reversal irrespective of whether the defendant demonstrates the error prejudiced his substantial rights. *See Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (canvassing cases and delineating the scenarios in which structural errors have been recognized). "It does not

20

necessarily follow, however, that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation." *Gibbons v. Savage,* 555 F.3d 112, 120 (2d Cir.2009), *cert. denied,* ―― U.S. ――, 130 S.Ct. 61, 175 L.Ed.2d 233 (2009). That is, "not every improper partial closure implicates [Sixth Amendment] concern[s]." *Brown v. Kuhlmann,* 142 F.3d 529, 536 (2d Cir. 1998); *see also Bowden v. Keane,* 237 F.3d 125, 129 (2d Cir. 2001) (explaining that a defendant's right to a public trial "is not trammeled, for example, by a trivial, inadvertent courtroom closure"); *Braun v. Powell,* 227 F.3d 908, 919 (7th Cir. 2000) (holding the exclusion of one spectator from an entire trial "does not implicate the policy concerns that inform the Sixth Amendment's right to an open trial").

Whether a particular closure abridges a defendant's Sixth Amendment rights hinges on its potential to undermine the values advanced by the public trial guarantee, which include (1) ensuring a fair trial; (2) reminding the government and the judge "of their responsibility to the accused and the importance of their functions"; (3) encouraging witnesses to come forward; and (4) discouraging perjury. *Peterson v. Williams,* 85 F.3d 39, 43 (2d Cir. 1996). In *Peterson,* for example, the Second Circuit held a closure that was "1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent" did not, in that instance, violate a defendant's Sixth Amendment rights. 85 F.3d at 44. Additionally, "the exclusion of a family member or friend may, in rare circumstances ..., not implicate the Sixth Amendment public trial guarantee." *Carson v. Fischer,* 421 F.3d 83, 94 (2d Cir. 2005); *see also United States v. Perry,* 479 F.3d 885, 890-91 (D.C.Cir. 2007) (finding a district court's exclusion of the defendant's son to be a trivial closure insufficient to raise constitutional concerns).

*United States v. Greene*, 431 F.App'x 191, 195 (3d Cir. 2011).

As further explained by the Third Circuit,

Although triviality is not determined by a single factor, *Morales v. United States,* 635 F.3d 39, 43 n. 7 (2d Cir. 2011), a closure was trivial and did not implicate the values advanced by the public trial guarantee when the trial judge was unaware of the closure and it was limited in both scope and duration. *See United States v. Al-Smadi,* 15 F.3d 153, 154 (10th Cir. 1994) (concluding that before a defendant can claim a violation of his Sixth Amendment rights, "some

affirmative act by the trial court meant to exclude persons from the courtroom" must occur); *Snyder v. Coiner,* 510 F.2d 224, 230 (4th Cir. 1975).

*United States v. Patton*, 502 F.App'x 139, 141-142 (3d Cir. 2012).

Here, as previously explained, the Court did not issue any order closing the courtroom at any time prior to, or during, the voir dire and jury selection process or take any other affirmative act which did, or could have been interpreted to, close the courtroom or exclude the public from entering.  Nor did any party inquire as to whether the courtroom was closed or inform the court of a belief that the public was not being admitted into the courtroom.  Furthermore, despite admitting that he was aware of this alleged violation during the jury selection and voir dire process,[7] Rinaldi inexplicably waited until after voir dire and jury selection had concluded, and a jury had been empaneled, to bring his concerns to this Court's attention.  Rinaldi did so despite several breaks being taken during the voir dire process in order to conduct individual voir dire as to a small number of jurors, strikes for cause, and to escort out the first panel of jurors and bring in the second panel of jurors, all times during which he could have informed the Court that he believed the public was being excluded from the courtroom.

Rinaldi asserts a belief, without ascribing the basis, that "the only people who would be allowed in the court during voir dire would be the pool of 30 jurors . . . because the court

---

[7] *See* Doc. 402, at 2 (stating that he made inquiries "as to why his friends and family were not allowed to attend the proceedings and he was told that the only people who would be allowed in the court during voir dire <u>would be</u> the pool of 30 jurors.") (underline added).

did not want to seat anyone in the jury box until the jury was actually seated since someone had to wipe and sanitize the seats every time the jurors would be taken out. . . ." (Doc. 402, at 2). Although Rinaldi contends that, "[i]n response to this[, his] friends and family complained to the jury clerk . . . but not not [*sic*] permitted entry to the Courtroom", he does not explain why, if true, Rinaldi or his stand-by counsel did not inform the Court of this alleged denial. Rinaldi also carefully focuses on the "jury box", which was reserved for jurors, and does not acknowledge the fact that there were chairs lining the side of the courtroom closest to the entryway which were available to the public.

As the trial judge in this case, this Court emphasizes that it issued no order, and made no statement of any kind, that the courtroom was closed at any time during the trial proceedings. The courtroom <u>was not</u> closed during voir dire and jury selection. Rinaldi's assertions otherwise, apparently purposely raised only after the completion of jury selection and empanelment of the jury, appear to be nothing more than an attempt to first create an issue at trial and delay those proceedings, and now to further an issue for post-trial and appellate consideration.

For these reasons, the Court will deny Rinaldi's request for a new trial on the basis of his argument that "during jury selection and voir dire process that the Court was closed to the public and this was a violation of Rinaldi's rights" (Doc. 402, at 1).[8]

---

[8] Rinaldi's baseless claim that the courtroom was closed during jury selection, and at no other time, further does not implicate any Sixth Amendment concerns where his claim amounts to nothing more than a claim of a trivial closure. *See e.g. Patton*, 502 F.App'x at 142 ("a closure was trivial and did not implicate the values advanced by the public trial guarantee when the trial judge was unaware of the closure and it

## 2.  Jury Verdict

Rinaldi next argues that he is entitled to a new trial in part because "he was denied a unanimous verdict" and that "a fatal variance took place."  (Doc. 402, at 3-4, 13). In support of this assertion, Rinaldi argues that the jury "was not required to find that each alleged member was a party to the Agreement" and that "the jury was not required to unanimously find who Rinaldi conspired with."  (Doc. 402, at 4) (underline in original).[9]

At the close of evidence, the Court instructed the jury, orally and in writing, as follows:

> In order for you to find Mr. Rinaldi guilty of conspiracy to distribute and possess with the intent to distribute a controlled substance, you must find that the government proved beyond a reasonable doubt each of the following three (3) elements:
>
> First: That two or more persons agreed to distribute and possess with the intent to distribute controlled substances. I will explain the elements of this offense to you shortly.
>
> Second: That Mr. Rinaldi was a party to or member of that agreement; and
>
> Third: That Mr. Rinaldi joined the agreement or conspiracy knowing of its objectives to distribute and possess with the intent to distribute controlled substances and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that Mr. Rinaldi and at least one other alleged conspirator shared a unity of purpose and the intent to achieve those objectives.

---

was limited in both scope and duration."); *Greene*, 431 F.App'x at 196 ("[C]ourts have placed considerable emphasis on the role of the trial judge in assessing whether a closure is of constitutional magnitude and have resisted ascribing to judges the unauthorized actions of courthouse personnel.")(collecting cases).

[9]  The Court notes that this argument in support of Defendant's motion for a new trial goes only to Count 1 of the Superseding Indictment as it only addresses the conspiracy of which Rinaldi was convicted.

(Trial Tr., Aug. 24, 2020, at 133-134; Doc. 394, at 15-16). In pertinent part, in explaining the first element of a conspiracy (existence of an agreement), the Court explained:

> The government also does not have to prove that all the members of the conspiracy directly met, or discussed between themselves their unlawful objectives, or agreed to all the details, or agreed to what the means were by which the objectives would be accomplished. The government is not even required to prove that all the people named in the indictment were, in fact, parties to the agreement, or that all members of the alleged conspiracy were named, or that all members of the conspiracy are even known. What the government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at some type of agreement, mutual understanding, or meeting of the minds to try to accomplish a common and unlawful objective.

(Trial Tr., Aug. 24, 2020, at 134-135; Doc. 394, at 17-18).

At Rinaldi's request, the Court also included a jury instruction addressing a "multiple conspiracy", first explaining in the instruction that Rinaldi "has argued that there were really more than one conspiracy" and then that "[w]hether a single conspiracy or multiple conspiracies exist is a question of fact for you to decide" (Trial Tr., Aug. 24, 2020, at 139; Doc. 394, at 21). Rinaldi's argument in his present motion for a new trial now centers on the following instruction given by the Court in explaining the definition of a multiple conspiracy:

> In deciding whether there was one single conspiracy or more than one conspiracy, you should concentrate on the nature of the agreement proved by the evidence. To prove a single conspiracy, the government must prove beyond a reasonable doubt that **each of the alleged members or conspirators** agreed to participate in what he or she knew or should have known was a single group activity directed toward a common objective. The government must prove that there was a single agreement on an overall objective.

(Trial Tr., Aug. 24, 2020, at 139-140; Doc. 394, at 22) (bold added). Rinaldi's singular focus

on this passage ignores the remainder of the jury instructions regarding multiple

conspiracies, which explain that:

> Multiple conspiracies are separate agreements operating independently of each other. However, a finding of a master conspiracy that includes other, sub-schemes does not constitute a finding of multiple, unrelated conspiracies. A single conspiracy may exist when there is a continuing core agreement that attracts different members at different times and which involves different sub-groups committing acts in furtherance of an overall objective.
>
> In determining whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies, you should consider whether there was a common goal among the alleged conspirators; whether there existed common or similar methods; whether and to what extent alleged participants overlapped in their various dealings; whether and to what extent the activities of the alleged conspirators were related and interdependent; how helpful each alleged coconspirator's contributions were to the goals of the others; and whether the scheme contemplated a continuing objective that would not be achieved without the ongoing cooperation of the conspirators.
>
> A single conspiracy may exist even if all the members did not know each other, or never sat down together, or did not know what roles all the other members would play. A single conspiracy may exist even if different members joined at different times, or the membership of the conspiracy changed over time. Similarly, there may be a single conspiracy even though there were different sub-groups operating in different places, or many acts or transactions committed over a long period of time. You may consider these things in deciding whether there was one single conspiracy or more than one conspiracy, but they are not necessarily controlling. What is controlling is whether the government has proved beyond a reasonable doubt that there was one overall agreement entered into by Mr. Rinaldi on one or more common objectives.

(Trial Tr., Aug. 24, 2020, at 140-141; Doc. 394, at 22-23).[10]

Third Circuit "jurisprudence distinguishes between challenges to the sufficiency of the evidence, in which the [Defendant] claims that the government failed to prove an essential element of conspiracy, and variance claims, in which the [Defendant] argues that the government proved multiple conspiracies instead of the one charged in the indictment." *United States v. Kemp*, 500 F.3d 257, 287 n.18 (3d Cir. 2007). "A defendant alleging a variance between a single conspiracy charged in an indictment and the proof presented at trial must demonstrate, first, that there was such a variance and, second, that the variance prejudiced one of his substantial rights. Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies." *Perez*, 280 F.3d at 345 (internal quotation marks and citations omitted).

Here, for substantially the same factual and legal reasons set forth in addressing Defendant's assertion in support of his motion for judgment of acquittal that "at most the evidence showed two different conspiracies" (Doc. 403, at 2), the Court finds no merit to Rinaldi's argument that "he was denied a unanimous verdict" and that "a fatal variance took place" (Doc. 402, at 3-4, 13). Defendant has not demonstrated that a variance existed between the single conspiracy charged in the indictment and the proof presented at trial, and as a result, he has neither demonstrated, nor could he demonstrate, that he suffered

---

[10] The afore-quoted instructions are all set forth in the Third Circuit's Criminal Model Jury Instructions and are in accord with Third Circuit case law.

any prejudice.  The jury, as the finder of fact, determined the existence of a single

conspiracy.  As extensively set forth, *supra*, the evidence presented at trial was sufficient to

demonstrate that a single conspiracy to sell controlled substances existed and that the

participants in the conspiracy were significantly intertwined and their actions were

interrelated and overlapped to such an extent that they furthered one common goal.  The

jury heard significant evidence with respect to Rinaldi's possession of heroin, sale of heroin

to other individuals, his ability to obtain heroin from other individuals, and the money derived

from his participation in the sale of heroin which was shared among several individuals and

which was used to buy controlled substances, including, but not limited to, heroin.  Nor can

Rinaldi claim that he was denied a unanimous verdict where, following the Court's reading

of the verdict as to Count 1 and Count 2 of the First Superseding Indictment, each juror was

polled as to whether this was their verdict and each juror responded in the affirmative.  (*See*

Trial Tr., Aug. 26, 2020, at 23-25).

### 3.  "Unavailable" Witnesses

Rinaldi next argues that the Court, apparently *sua sponte*, "should have granted a

continuance or declared a mistrial based on unavailable witnesses."  (Doc. 402, at 6).

Rinaldi asserts that he "intended to call Steven Powell and Christopher Peterson as

witnesses but they were both unavailable."  (*Id.*).

It is well-established that "[a] criminal defendant has broad rights concerning the

production of evidence."  *United States v. Cruz-Jiminez*, 977 F.2d 95, 99 (3d Cir. 1992).

> Among [these rights], as a fundamental element of due process, is the right to offer testimony of witnesses and to compel their attendance, if necessary, in support of a defense to criminal liability.  Thus, the Sixth Amendment to the United States Constitution gives the criminally accused the right to offer testimony of favorable witnesses and "to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI.  The Supreme Court has held that the Compulsory Process Clause includes a criminal defendant's right to present witnesses or evidence in his defense even though [such a right] is not expressly described in so many words.

*Cruz-Jiminez*, 977 F.2d at 100 (internal citations omitted). However, as explained by the Supreme Court, the availability of the Compulsory Process Clause "is dependent entirely on the defendant's initiative."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  As such, "the right to compel the presence and present the testimony of witnesses provides the defendant with a sword that may be employed to rebut the prosecution's case. The decision whether to employ it in a particular case rests solely with the defendant. The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct."  *Taylor*, 484 U.S. at 410.  "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.  The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony."  *Taylor*, 484 U.S. at 410-411.

Here, on the afternoon of Friday, August 21, 2020, the Government rested its case-in-chief.  At that time, Defendant moved for judgment of acquittal, which the Court denied.

(Trial Tr., Aug. 21, 2020, at 112-117).  Rinaldi then called seven witnesses (*id*. at 119-150)

and thereafter informed the Court that he "ha[d] no more for today" but that he "ha[d] more

that are under subpoena, but no more for today" (*id*. at 150).  When the Court inquired

where these witnesses were, the following exchange occurred:

> **MR. RINALDI**: One of them is [Steven] Powell, and he's in the hospital, and the
> other witness I was trying to subpoena is Christopher Peterson, I was trying to
> enforce the subpoena on Christopher Peterson to have him come testify.
>
> There's a possibility that – I just received a couple things today, so I may want
> to recall Andrew Henry and Duwayne Brown. [Steven] Powell is in the hospital
> right now, but I issued a subpoena to him.
>
> **THE COURT**: What is the nature of his illness and where is he?
>
> **MR. RINALDI**: He's in Las Vegas, he has cancer, and he just caught COVID,
> so he's recovering from COVID and he has cancer.

(Trial Tr., Aug. 21, 2020, at 150). Although Rinaldi represented that Powell had been

served, his stand-by counsel clarified that "we do not know the status" of service.  (*Id.* at

151).  With respect to Peterson, Rinaldi informed the Court that:

> I'm trying to have the Government enforce the subpoena they already got on
> him.  If I have to issue a separate subpoena, I will, but right now, we're just
> hoping they enforce the subpoena they already issued.

(*Id.*).  In addressing this issue, the Government stated that: "As far as Mr. Peterson goes, if

Mr. Rinaldi wants to subpoena him, he can serve him with a subpoena.  The Government

has attempted to locate him, we were unable to, the subpoena cannot be enforced at this

time."  (*Id.* at 152-153).  The Court thereafter informed Rinaldi that he should continue to

attempt to serve Powell and Peterson and that he would be expected to continue the

presentation of his witnesses on Monday.  In response, Rinaldi made clear that he "[did not]

want [the trial] to be postponed" and that he "want[ed] to get it over with", but that he

"want[ed] [Powell and Peterson] to be here Monday. . . ."  (*Id*. at 153-154).

On Monday, August 24, 2020, Defendant called one witness to the stand and, when

subsequently asked whether he had another witness, informed the Court that "the last two

witnesses were intended to be Christopher Peterson and [Steven] Powell.  Both of them are

unavailable."  (Trial Tr., Aug. 24, 2020, at 11). After the jury was removed from the

courtroom, Rinaldi, despite having stand-by counsel to aid him, simply informed the Court

that "I don't know what are my options, if my witnesses are unable to attend?  I don't know

what my options are."  (*Id*. at 12-13).  At no time did Rinaldi request a continuance of the

trial, that the Court declare a mistrial, or any other form of relief from the Court.

The Court thereafter engaged in a careful analysis as to the circumstances

surrounding Powell and Peterson's absences. (Trial Tr., Aug. 24, 2020, at 12-18).  The

Court first addressed Powell's absence and then concluded as follows:

> You have known from the outset that Mr. Powell might be someone you would
> call as a witness, you have long known Mr. Powell is suffering from cancer and
> undergoing treatment, you have long known that he resides in Las Vegas,
> Nevada, you have long known that Mr. Powell was an unindicted co-conspirator
> in this case.
>
> On July 17, 2020, you filed a motion requesting issuance of a subpoena to
> Powell, and in support of that motion, you asserted that Mr. Powell could testify
> that he did not enter into the charged conspiracy, and he did not instruct you to
> meet with the confidential source Christopher Peterson.

> Again, I granted your Motion for the Issuance of Subpoena, and I did that on July 22, over a month ago. Now, you tell me you're unable to procure Mr. Powell's attendance.
>
> This is what it boils down to. You've had more than ample time to procure Mr. Powell's appearance. In addition, when you knew you were unable to obtain Mr. Powell's appearance, you could have invoked Federal Rule of Criminal Procedure 15 well before the beginning of this trial by moving that Mr. Powell be deposed, in order to preserve his testimony for trial.

(*Id.* at 14-15).  With respect to Peterson, the Court set forth the contents of several documents filed of record by Rinaldi, including an "Affidavit of Michael Rinaldi" and a pre-trial motion by Rinaldi, both filed in December of 2018, and thereafter explained:

> So as for Mr. Peterson, in my mind, your affidavit and your pre-trial motion that went with it leave no question that as early as December 10, 2018, you knew that Christopher Peterson was Confidential Source No. 2. Yet, despite this, you have made absolutely no effort to procure his attendance at trial by subpoena.
>
> This is particularly important because your affidavit asserts that his testimony would have been helpful to you and would have undermined the Government's case.

(*Id*. at 17). In concluding its examination of the record as to Powell and Peterson, the Court summarized:

> So that's a long way around telling you that those people are not here, you were well aware of them, you were well aware of their importance or significance to the case. They are not here, you made no effort to get them here, you made no effort to take any depositions, so any request for a continuance is denied, to the extent that you're making one.

(*Id*. at 18).[11]

---

[11] In light of Rinaldi's statement on August 21 that he did not want a continuance, and the absence of any request on August 24 for a continuance, it is unclear what relief Rinaldi believes he was *sua sponte*

Although the Court fully incorporates herein its analysis which was set forth at trial on August 24, 2020 (*see id.* at 12-18), it will again reiterate its reasoning for allowing the trial to continue despite Powell and Peterson's absences.

With respect to Powell, Rinaldi now asserts that he "maintained constant communication with [him] over the telephone", that he subpoenaed Powell, and that Powell informed him that he would testify as a witness. (Doc. 402, at 6). Rinaldi claims that "there was no indication that Powell would be unavailable or be a reluctant witness," but that "in late July or early August, Powell was diagnosed with Covid 19" and hospitalized. (*Id.* at 6-7). Although Rinaldi admits that Powell "was undergoing cancer treatment", he asserts that Powell "was otherwise in good health" and "fully intended to testify". (*Id.* at 7).

Preliminarily, Rinaldi blatantly mischaracterizes Powell's health condition. On August 21, 2018, in addition to returning an indictment against Rinaldi in the present action, the federal grand jury also returned a separate indictment charging Rinaldi, Powell, and several other individuals of conspiracy to distribute controlled substances. (*See* 3:18-cr-280, Doc. 1). A review of the record in criminal case 3:18-cr-280 reflects that Powell suffered from advanced cancer from on or about mid-2018 until his passing on December 26, 2020. (*See* 3:18-cr-280, Doc. 214 (explaining Powell was diagnosed with stage IV colon cancer in March of 2018); 3:18-cr-280, Doc. 271 (death certificate for Steven Powell)). For

---

entitled to from the Court. In particular, Rinaldi's statements on August 21 that he did not want a continuance, but nonetheless wanted Powell "to be here Monday" despite knowing of Powell's hospitalization in Las Vegas for COVID-19, are irreconcilable.

example, in a letter dated April 1, 2019, counsel for Powell requested a conference call with the Court to address "defendant's unique health issues."  (3:18-cr-280, Doc. 139).  In a follow-up letter subsequent to the conference, dated July 29, 2019, counsel for Powell set forth the details of Powell's diagnosis of stage IV Cancer, his numerous other serious health issues, and the course of treatment which his physicians in Nevada had established for him. (3:18-cr-280, Doc. 174).  In an additional letter, dated January 14, 2020, Powell's counsel again updated the Court on Powell's health condition, indicated a series of serious continuing health issues related to the cancer and its ongoing treatment, and informed the Court that Powell's medical team "will not clear him to fly to Pennsylvania."  The letter further details that Powell's medical team believed that any "respite" from chemotherapy to allow Powell's "body to recover from the side effects of the chemotherapy . . . however brief, would be ill-advised at this time."  (3:18-cr-280, Doc. 214). [12]  On December 26, 2020, Powell passed away in the Intensive Care Unit of Centennial Hills Hospital Medical Center in Las Vegas, Nevada, from "Cardiac Arrest due to, or as a consequence of Failure to Thrive due to, or as a consequence of Stage IV Colon Cancer Unknown Cell Type."  The Certificate of Death further lists "End Stage Renal Disease" and "Metabolic Acidosis" as

---

[12] Due to the sensitive nature of the letters, they are filed under seal and the Court thus does not detail herein the specifics of Powell's health issues or prescribed treatments.

"conditions contributing to death, but not resulting in the underlying cause."  (3:18-cr-280, Doc. 271, ¶¶ 2, 3(b), 3(c), 3(e), 25).[13]

In addition, there is no question that Rinaldi was aware that Powell suffered from severe and chronic medical problems, including ongoing cancer treatments and other serious health issues.  On June 13, 2019, Rinaldi filed a "Motion for Severance" in both criminal actions (3:18-cr-279, Doc. 155; 3:18-cr-280, Doc. 157) arguing that his trials in those cases should be severed because, in part, Powell continued to seek extensions of time because he "is suffering from cancer and he is undergoing treatment" and, in the alternative, requesting relief in the form of dismissal of Powell's indictment, further stating that Powell "can be re-indicted *if his treatment is successful*" (emphasis added).  In the present pending motion for a new trial, Rinaldi also acknowledges that he was aware Powell "was undergoing cancer treatment" in the time leading up to trial (Doc. 402, at 7).

For these reasons, it is evident that Rinaldi's assertions that, aside from undergoing cancer treatments, Powell "was otherwise in good health", was "physically fit", and that but for Powell's diagnosis of COVID-19 and hospitalization "in late July or early August", Powell would have been present and capable of testifying in person at the trial beginning August 17, 2020 (Doc. 402, at 6-7), are knowingly false and completely belied by the record.

---

[13] Steven Powell's Certificate of Death further states that the death was not "due to communicable disease", indicating that COVID-19 was not the cause of his death. (*See* 3:18-cr-280, Doc. 271, ¶ 24(c)).

Additionally, Powell's serious and chronic health issues would have formed the basis for a motion by Defendant to take Powell's deposition for trial purposes.  Pursuant to Federal Rule of Criminal Procedure 15, "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  Rinaldi's assertion that the situation only "became sufficiently exceptional" to justify a deposition request after Powell's diagnosis of COVID-19 (Doc. 402, at 7) is without basis in light of the Court's recitation herein of Powell's lengthy and serious health issues, Powell's death only four months after trial began, and Powell's permanent residency in Las Vegas, Nevada.

Further, this Court, on July 22, 2020, granted Defendant's request for the issuance of a subpoena to Steven Powell, addressed to Powell's residence in Las Vegas.  (*See* Docs. 315, 316).[14]  Rinaldi thus had over three weeks to serve Powell and secure Powell's presence or trial deposition testimony following the issuance of the subpoena.  Additionally, Rinaldi admits that Powell was hospitalized "in late July or early August" (Doc. 402, at 6-7), which is either prior to, or approximately the same time, that the subpoena was issued, thereby putting Rinaldi on notice that Powell may not be available to travel and testify in

---

[14] The Court granted Rinaldi's motion for the issuance of subpoenas to Steven Powell and Yuri Yuvadov.  (Doc. 316).  The Court further granted Rinaldi's motion for writs of habeas corpus ad testificandum for Rashane Coley, Joan Mejia, and James Rought.  (Doc. 378).

The Court denied Rinaldi's motion for the issuance of subpoenas to then-sitting President of the United States Donald J. Trump, former Attorney General Jefferson Sessions, former Secretary of Homeland Security Kirstjen Nielson, and former Acting Head of the Drug Enforcement Agency Robert M. Patterson.  (Doc. 344).

person due to his hospitalization. Nonetheless, Rinaldi did not raise the issue of Powell's hospitalization or possible issues relating to the ability of securing Powell's presence in Court until the afternoon of Friday, August 21, 2020, five days after the commencement of trial. (Trial Tr., Aug. 21, 2020, at 150). Thus, despite being provided with the "sword" to attempt to rebut the prosecution's case, i.e. a subpoena, Defendant made the decision not to effectively employ it by neglecting to engage in the necessary "deliberate planning and affirmative conduct," *Taylor*, 484 U.S. at 410.

With respect to Peterson, Rinaldi claims that he "did not intend to call Christopher Peterson as a witness" because he "fully expected that Christopher Peterson would continue to lie and implicate Rinaldi." (Doc. 402, at 8). Rinaldi asserts that on the fourth day of trial, August 20, 2020, he was provided additional Jencks material and the Government "for the first time informed Rinaldi that not only would Christopher Peterson's testimony be favorable to Rinaldi but also that the government may no longer call Christopher Peterson." (*Id.* at 8-9).[15]

Rinaldi again willfully ignores the full record in this case and engages in deceptive practices in asserting that he did not know that Peterson may have been a favorable

---

[15] Rinaldi's assertion that he was first placed on notice of Peterson's new statements or possible new testimony on August 20, 2020, presents yet another example of Rinaldi's intent to mislead the Court. Rather, on August 18, 2020, the Government informed the Court that it had "provided in an informal way" a witness's statement "who gave information that was different from other statements", referencing Peterson's new statements to the Government obtained during trial preparation on August 17 and August 18, 2020. (Trial Tr., Aug. 18, 2020, at 120). On August 19, 2020, the Government stated to the Court, and Rinaldi again did not dispute, that it had officially turned over the Jencks Addendum relating to Peterson earlier that day. (Trial Tr., Aug. 19, 2020, at 128).

witness well-prior to the commencement of trial.  As noted by the Court at trial, on December 10, 2018, almost two years before trial began, Rinaldi filed "Affidavit of Michael Rinaldi", stating that "the person the government refers to as CS2 is known to me as Christopher Peterson" and detailing a conversation he had with Christopher Peterson. (Doc. 83).  Rinaldi's "Affidavit" states, in part, that Peterson told him that he suffered from "stage 4 cancer", was addicted to cocaine, heroin, and marijuana, that he "was threatened and forced to make phone calls inquiring about purchasing narcotics and to make controlled buys", that he tried to "set people up due to threats, force, coercion and duress", and that he "was trying to set [Rinaldi] up because he believed that [Rinaldi] and his kids mother may have been involved in a sexual relationship. . . ."  (*Id.*).  Rinaldi's "Affidavit", as well as his pre-trial motion filed December 20, 2018 requesting unredacted phone tap affidavits because "CS-2 is known to Michael Rinaldi as Christopher Peterson" (Doc. 89), make clear that Rinaldi knew Peterson's identify and involvement in this case for almost two years prior to trial.  Nonetheless, despite the assertions set forth in Rinaldi's "Affidavit" as to what Peterson said occurred, Rinaldi made no effort to even attempt to procure Peterson's attendance at trial by subpoena or otherwise either prior to, or during, the trial.

For these reasons, Rinaldi's assertion that he is entitled to a new trial because the Court should have, *sua sponte* and in the absence of any request by Defendant, "granted a continuance or declared a mistrial based on unavailable witnesses" (Doc. 402, at 6), where Defendant made no effort to secure these witnesses, will be denied.  *See Taylor,* 484 U.S.

at 415-416 ("the Compulsory Process Clause cannot be invoked without the prior planning and affirmative conduct of the defendant. . . . Routine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those whose testimony will be offered at trial.").

### 4.  Discovery/Jencks

Finally, Rinaldi argues that he is also entitled to a new trial because "the government repeatedly violated the rules of discovery as well as Jencks."  (Doc. 402, at 11). Specifically, Rinaldi asserts the following violations:

- He "did not receive a copy of the recorded phone call listed as Exhibit B [June 6, 2018, recorded call between Peterson and Rinaldi] until 10 days before trial but due to the prison lockdown Rinaldi was unable to listen to it" and that he "was not provided with a copy of the transcript until during trial."  (*Id.* at 11).

- He "was not provided with or permitted to inspect the package that the Government alleges that a kilo of cocaine was wrapped in or two telephones belonging to Dwayne Brown."  (*Id.* at 11-12).

- He has not been allowed to "inspect the recording device[, n]or did the government demonstrate that the DEA Agent was proficient in the use of the device."  (*Id.* at 12).

- He did not receive "the government transcripts" until trial, thereby preventing him from challenging their accuracy. (*Id.*).

39

- The Government "did not turn over all of DEA Agent Kaluzny's prior statements";

  Rinaldi "was not provided a copy of the search warrant affidavits from 8B Birchwood

  Court and 143 Blackman Street until after Kaluzny testified"; and Rinaldi "was not

  permitted to inspect or copy any other the items [*sic*] that were seized until after

  Kaluzny was done testifying."  (*Id.*).

Although the Court will address these assertions in turn, it is compelled to first note

that Defendant's allegations as to violations by the Government of its discovery and Jencks

obligations are repeatedly belied by the record and are disingenuous attempts to create

issues where it is clear that no error or misconduct by the Government exists.

At trial, the Government moved for admission of the following exhibits: (1) Call 1 from

Peterson to Powell on May 11, 2018 (Gov. Ex. 5); (2) Call 2 from Peterson to Powell on May

11, 2018 (Gov. Ex. 6); (3) Call 1 from Peterson to Powell on May 14, 2018 (Gov. Ex. 8); (4)

Call 2 from Peterson to Powell on May 14, 2018 (Gov. Ex. 9); (5) Body recording by

Peterson of controlled buy on May 14, 2018 (Gov. Exs. 11, 11.1); (6) Call from Peterson to

Rinaldi on May 22, 2018 (Gov. Ex. 12); and (7) Call from Peterson to Rinaldi on June 6,

2018 (Gov. Ex. 35).  (Trial Tr., Aug. 20, 2020, at 91-92).  Rinaldi objected, first stating that

"some of these recordings was the ones that were just turned over to me the week prior to

trial".  (*Id.* at 92).  However, upon further questioning by the Court, Defendant admitted that

he agreed with the Government that he had received recordings of all of the phone calls,

with the exception of Government's Exhibit 35 (June 6, 2018 call from Peterson to Rinaldi),

in or around February of 2020.  (*Id.* at 96-97).  Despite Rinaldi's admission, the Court

nonetheless twice offered to adjourn trial and allow Defendant the opportunity to take "the

rest of the day to view all those tapes" or other material if he so chose.[16]  (*Id.* at 99-100).

Rinaldi specifically declined this opportunity.  As a result, the Government clearly fulfilled its

discovery obligations with respect to the telephone recordings and video recording and, to

the extent that Rinaldi now claims that he was unable to listen to the June 6, 2018 recording

prior to trial (Doc. 402, at 11), he was offered the opportunity to cure any possible prejudice

and declined to take any measures to remedy his issue.

      Furthermore, Rinaldi's assertion that he did not receive "the government transcripts"

until trial, thereby preventing him from challenging their accuracy (Doc. 402, at 12) is without

foundation.  The use of transcripts as a listening aid is a common practice in criminal

proceedings and is reviewed for an abuse of discretion, *United States v. DiSalvo*, 34 F.3d

1204, 1220 (3d Cir. 1994).  Where a district court provides "a clear and precise limiting

instruction to the jury in which it state[s] that the transcript [is] not evidence, but merely an

aid to assist in viewing the recording", any "confusion that the transcript could have caused

[is] cured through the use of this limiting instruction."  *United States v. LaBoy*, 505 F.App'x

182, 184 (3d Cir. 2012) (citing *Gov't of V.I. v. Martinez*, 847 F.2d, 128 (3d Cir. 1988)

("approving use of transcript by jury because court provided limiting instructions that

---

[16]  This exchange with the Court and the parties occurred outside the presence of the jury at approximately 12:20 p.m., providing Defendant with the entire afternoon to listen to the telephone recordings and view/hear the video recording.

'properly advised the jury as to the limited role to be served by the transcript'")).  *See also*, *DiSalvo*, 34 F.3d at 1220 (finding no abuse of discretion in part because Defendant "fails to point out where he has been misidentified" and "the district court carefully warned the jury on several occasions that the transcript was not evidence.").

At trial, Rinaldi objected to the transcripts "go[ing] in", asserting that "a transcript is opinion testimony and should only be prepared and introduced through an expert witness." (Trial Tr., Aug. 20, 2020, at 145-146).  The Government noted in response that "Mr. Rinaldi has not raised an objection to the accuracy" of the transcripts and further represented that the transcripts "were turned over in advance of trial" (*id.* at 146), neither of which Defendant disputed.[17]  The Court allowed the transcripts to be shown to the jury, instructing that the "transcripts, themselves, are not evidence, they're being given to you only as a guide to help you follow what was being said" and that "[i]f you notice any differences between what you hear in the recordings and what you read in the transcripts, you must rely on what you hear not what you read. And if you cannot hear or understand certain parts of the recordings, then you must ignore the transcripts, as far as those parts are concerned."  (*Id.* at 146-147). The transcripts were not admitted into evidence.

Here, where Rinaldi has not shown any inaccuracies or errors in the transcripts, those transcripts were shown to the jury merely as a listening aid, were not admitted into

---

[17] Of note, in his post-trial motion, Rinaldi still does not challenge the accuracy of the transcripts shown to the jury.

evidence, and where the jury was clearly instructed that transcripts were not evidence and the jury should rely on what they heard, not read, there was no error by this Court. Nor can it be said that Rinaldi suffered any prejudice as a result of the jury viewing the transcripts contemporaneously with the audio and video recordings.

Rinaldi further alleges that he "was not provided with or permitted to inspect the package that the Government alleges that a kilo of cocaine was wrapped in or two telephones belonging to Dwayne Brown." (Doc. 402, at 11-12).

Although Rinaldi contends that he was not permitted to inspect the package allegedly containing a kilo of cocaine, he did not object to the admission of the package at trial. On August 18, 2020, during the direct examination of Task Force Officer John Egan, the Government moved to admit photographs of, as described by Egan, "the suspected narcotics that were found in the trunk of Mr. Brown's vehicle", to which Rinaldi did not object. (Trial Tr., Aug. 18, 2020, at 134). The Government thereafter moved, without objection, for the admission of the suspected narcotics. (*Id*. at 136-137; Gov. Ex. 17).[18] In the present motion, Rinaldi provides no argument as to why he is entitled to a new trial because he purportedly was not provided with, or permitted to inspect, the kilo of cocaine. Nor does Rinaldi explain how, if true, he was prejudiced by not being able to inspect the packaging. The jury found that Rinaldi did not engage in a conspiracy to distribute and

---

[18] Rinaldi objected only to the admission of the "mailing envelope" recovered from the trunk of Brown's car on the basis that he had first seen it on the previous day. (Trial Tr., Aug. 18, 2020, at 135). The Government agreed that the envelope had first been shown to Rinaldi the prior day, stating that it had also not seen it until "a day or two before that". (*Id*. at 135-136).

possess with intent to distribute cocaine in Count 1 and Rinaldi's conviction for distribution and intent to distribute cocaine in Count 2 does not derive from the package of cocaine found in the trunk of Brown's car.

Similarly, Rinaldi only mentions, in passing and without further argument, that he was not provided with or permitted to inspect the "two telephones belonging to Dwayne Brown" (Doc. 402, at 11-12).  At trial, during the direct examination of Brown, the Government moved to admit Government's Exhibit 33, identified by Brown as two of his cellphones.  (Trial Tr., Aug. 18, 2020, at 97).  Rinaldi first objected, stating that he had only fist seen the phones on Monday, the prior day.  The Government agreed, stating that it brought them "immediately to Mr. Rinaldi's attention" as soon as they came to the Government's attention over the weekend.  (*Id*. at 97-98).  When the Court asked Rinaldi whether there was "a significant, sincere, good faith objection to these phones being what this witness [Brown] says they are", i.e. "his phones", Defendant stated that he agreed that "that's what they are."  (*Id*. at 99).  Although the phones themselves were admitted into evidence, the Government did not attempt to elicit testimony as to the contents of any calls, texts, or other information contained on either cell phone.  Thus, again, the two cellphones identified by Brown as his own, did nothing more than present evidence that Brown had two cellphones in his car at the time he was arrested – Rinaldi has not demonstrated how any failure to provide him with these cellphones, or to disclose them at an earlier time, resulted in any prejudice to him or were in any way the product of prosecutorial misconduct.

Rinaldi additionally claims that he was not allowed to "inspect the recording device[, n]or did the government demonstrate that the DEA Agent was proficient in the use of the device."  (Doc. 402, at 12).

Pursuant to Federal Rule of Evidence 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The following examples, among others, satisfy this requirement:

> **(5) Opinion About a Voice.** An opinion identifying a person's voice – whether heard firsthand or through mechanical or electronic transmission or recording – based on hearing the voice at any time under circumstances that connect it with the alleged speaker.
>
> **(6) Evidence About a Telephone Conversation.** For a telephone conversation, evidence that a call was made to the number assigned at the time to:
> > **(A)** a particular person, if circumstances, including self-identification, show that the person answering was the one called . . .

Fed. R. Evid. 901(b)(5)-(6)(A).  The Third Circuit has "'repeatedly noted that the burden of proof for authentication [under Fed. R. Evid. 901] is slight.'"  *United States v. Walker*, 824 F.App'x 124, 130 (3d Cir. 2020) (quoting *Lexington Ins. Co. v. W. Penn. Hosp.,* 423 F.3d 318, 328 (3d Cir. 2005)); *see also*, *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994).

Here, Task Force Officer Kaluzny testified as to his law enforcement history and training, including that he had "received specialized training in basic drug investigations, street level drug investigations, narcotics identification" and that he had been trained "in wire

tap and electronic surveillance . . . ."  (Trial Tr., Aug. 20, 2020, at 73).  On direct

examination, Kaluzny also testified as follows:

> **Q**. As part of your training, education and experience, have you ever received any specialized training or certification, with respect to recorded conversations?
>
> **A**. Yes.
>
> **Q**. Can you describe that?
>
> A. I received a course of instruction presented by the Pennsylvania State Police, like I said, in the area of wiretap and electronic surveillance that included the use recording devices to record consensual audio recordings, the use of covert or concealable audio video devices on undercovers and/or confidential informants.
>
> **Q**. Does this training, the devices that you say you were trained on, does that include digital recording devices?
>
> **A**. Yes.
>
> **Q**. Does it include, in portions of your training and experience, the collection of evidence from such devices?
>
> **A**. Yes.
>
> **Q**. And the maintenance and security of that evidence?
>
> **A**. Yes.

(*Id.* at 73-74).

Kaluzny explained that, in preparing for a controlled purchase, the task force records

the phone calls placed by the confidential informant utilizing "a small digital recorder" and he

can hear the call "in real time", stating:

> There's actually two jacks on the recording device that can accommodate two sets of ear buds, everybody is familiar with ear buds. The one ear bud will be utilized by the cooperator or the informant, the other ear buds will be utilized by myself, so as I could listen to the conversations real time, which is also a measure taken to protect the integrity of the investigation.

(*Id.* at 83).  Kaluzny confirmed that the recording device used stores the data "that comprises the digital recording in the device" and that this was the type of device he had training and experience with.  (*Id.* at 84).

At the controlled buy, Kaluzny testified that the confidential informant uses a "discrete" digital device which records and stores the data that comprises the recording on the device itself.  (Trial Tr., Aug. 20, 2020, at 86). That data is subsequently downloaded to "a disk" which is processed and logged into evidence.  (*Id*. at 86).  Kaluzny also testified that he "review[s] the recordings, prior to logging them into evidence, first of all, to make sure that the device is functioning properly, and, you know, for [him] to understand what happened during the buy itself" if he was not present.  (*Id.* at 86-87).  Kaluzny confirmed that these "covert recording devices" were also included in the training and experience that he testified to having about recording devices and digital recording devices.  (*Id.* at 87).

In the present case, Kaluzny testified that initial arrangements for a controlled buy were made "via telephone calls" between Christopher Peterson, the confidential informant, and Steven Powell.  (Trial Tr., Aug. 20, 2020, at 88-89).  Kaluzny stated that he had reviewed the audio recordings and video recording prior to trial and was familiar with the voices on the recordings, specifically identifying Peterson, Powell, and Rinaldi.  (*Id.* at 90).

Kaluzny stated that he was familiar with Peterson's voice "[t]hrough conversations" he had

directly with Peterson, was familiar with Powell's voice because he had heard it "at his court

proceedings and . . . during an interview with the U.S. Attorney's Office", and was familiar

with Rinaldi's voice because he had spoken with him on the day of his arrest, during court

proceedings, and in reviewing prison phone calls.  (*Id*. at 90-91).[19]

Following this testimony, the Government moved for the admission of the phone

recordings and video recording.  However, upon Rinaldi's objection, the Court provided

Rinaldi an opportunity to voir dire Kaluzny as to the authenticity of the tapes.  (Trial Tr., Aug.

20, 2020, at 99-100).  During Rinaldi's voir dire, Kaluzny reiterated that he was present with

Peterson at the time all of the phone calls were recorded.  (*Id.* at 101). Upon further

questioning by Rinaldi and the Government, the Court ordered the jury be excused from the

courtroom and held a hearing to determine whether Peterson voluntarily consented to the

recordings.  (*Id.* at 107-108; 110-130). Following the hearing, the Court overruled Rinaldi's

objection, finding that the Government had met its burden, that the recordings were made

consensually, and ruled that the recordings would be admitted into evidence.  (*Id*. at 128;

*see also, id*. at 139-140).

In light of the afore-stated sequence of events and foundation testimony by Kaluzny,

Rinaldi's argument that the Government failed to establish that Kaluzny was "proficient in

---

[19] *See* Fed. R. Evid. 901 advisory committee's notes to proposed rules (explaining with respect to Rule 901(b)(5) that "[s]ince aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired either before or after the particular speaking which is the subject of the identification.").

the use of the device" or his implication that the recordings should not have been admitted because he was not permitted to inspect the recording device (Doc. 402, at 12) are each entirely without merit.  Kaluzny testified as to his training and experience in using recording equipment, explained how the equipment was used in this case, testified that he was physically present for each telephone recording, that he had reviewed the recordings, and he set forth the basis for his familiarity with each voice in the recordings.  The Court further determined, after hearing testimony, that the recordings were consensually made with Peterson.  Under Rule 901, the testimony and evidence provided at trial were sufficient to establish the authenticity of the recordings such that they were properly admitted into evidence.  It was for the jury to then determine what weight, if any, to assign to the recordings. *See Reilly*, 33 F.3d at 1404 ("'Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court.'")(quoting *United States v. McGlory*, 968 F.2d 309, 328-329 (3d Cir. 1992)); *id.* at 1404-1405 ("'Satisfaction of the requirement of authentication or identification is a matter to be approached in accordance with Rule 104(b). Accordingly once the court finds that evidence has been introduced sufficient to permit a reasonable juror to find that the matter in question is what its proponent claims, a sufficient foundation for introduction in

evidence has been laid, Rule 104(b).'") (quoting Michael H. Graham, Federal Practice and

Procedure: Evidence § 6821 at 849 (Interim Edition 1992)).[20]

Finally, Rinaldi asserts that the Government "did not turn over all of DEA Agent

Kaluzny's prior statements", that he "was not provided a copy of the search warrant

affidavits from 8B Birchwood Court and 143 Blackman Street until after Kaluzny testified";

---

[20] Defendant also asserts in cursory fashion that he has been "prevented . . . from challenging th[e recording] evidence based on the 3rd Circuit ruling in Starks" due to the Government not allowing him to inspect the recording equipment or allegedly not demonstrating that "the DEA Agent was proficient in the use of the [recording] device" (Doc. 402, at 12) (referring to *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975)).  However, "[i]t is unclear whether *Starks* remains relevant after the enactment of Fed.R.Evid. 901." *United States v. Than Le*, 542 F.App'x 108, 117 n.8 (3d Cir. 2013).  *See also*, *United States v. Toler*, 444 F.App'x 561, 564 n.1 (3d Cir. 2011) ("acknowledg[ing] the Government's argument that *Starks* was abrogated by Federal Rule of Evidence 901(a), which requires a lesser showing to authenticate evidence" but declining to "comment on the relationship between *Starks* and Rule 901".).

Regardless, even applying the seven factor test set forth in *Starks*, the Government produced "clear and convincing evidence of authenticity and accuracy as a foundation for the admission of [the] recordings", *Starks*, 515 F.2d at 121 (quoting *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967)).  In *Starks*, the Third Circuit explained that "a foundation must be established by showing" seven facts, specifically:

    (1) That the recording device was capable of taking the conversation now offered in evidence.
    (2) That the operator of the device was competent to operate the device.
    (3) That the recording is authentic and correct.
    (4) That changes, additions or deletions have not been made in the recording.
    (5) That the recording had been preserved in a manner that is shown to the court.
    (6) That the speakers are identified.
    (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Starks*, 515 F.2d at 121 (quoting *United States v. McKeever*, 169 F.Supp. 426, 430 (S.D.N.Y. 1958)). Nonetheless, "it is difficult to lay down a uniform standard equally applicable to all cases." *Id*.  As set forth in this memorandum opinion, at trial and prior to the admission of the recordings, the Government presented testimony and other evidence to demonstrate that Kaluzny was familiar with, and capable of operating, the recording devices, that he reviews the recordings prior to entering them into evidence, and that he verified that the recordings accurately reflected the conversations he personally heard while they were being recorded.  Kaluzny further identified each speaker and provided the basis of his knowledge for his identification of each speaker.  The Court also heard testimony outside the presence of the jury in deciding that Peterson voluntarily and in good faith consented to the making of each recording.

and that he "was not permitted to inspect or copy any other the items [*sic*] that were seized

until after Kaluzny was done testifying."  (Doc. 402, at 12).

With the exception of Defendant's reference to the search warrant affidavits, the

breadth and vagueness of Rinaldi's assertions as to what he contends was not properly

provided to him render an evaluation of his argument difficult.  The Court thus turns to the

trial record in an attempt to fully address Defendant's arguments.

On Friday, August 21, 2020, following direct and cross-examination of Kaluzny by

the parties, the Court excused the jury for lunch.  At that time, Rinaldi stated that it was his

"position that this [the search warrant affidavits] is both Brady and Jencks material, because

they're prior statements that he made, the affidavits that he filled out for these searches,

they're prior statements of the witness, and none of this has ever been turned over to me."

(Trial Tr., Aug. 21, 2020, at 62).  Defendant further asserted that "miscellaneous

paperwork", which was "[his] property" and which he contended included "gambling

receipts" and "fake pay stubs", was not provided to him.  (*Id.*).[21]  At that time, the

---

[21]  The Court has previously examined the purported relevance and exculpatory value of Defendant's "gambling receipts".  In a Memorandum Opinion addressing Defendant's Motion for Reconsideration (Doc. 301) of the Court's denial of Defendant's motion to dismiss (Docs. 298, 299), the Court explained that the items at issue, including documents in Rinaldi's vehicle which allegedly "demonstrate[ed] illegal gambling[,] fail to help Rinaldi establish the timeline which he claims would undercut the claims that he engaged in a conspiracy." (Doc. 335, at 18).  As the Court further reasoned:

> Here, inherent in Defendant's premise that the cellphones, photographs, and documents are necessary to create a "timeline" is that he could not have been engaging in a conspiracy and, for example, gambling, at the same time.  There is nothing to suggest that the possession of gambling receipts would demonstrate that Rinaldi could not have engaged in actions in furtherance of a conspiracy. . . .  Rinaldi's day-to-day actions and whereabouts on a given day are not, in and of themselves, any evidence that would tend to show a lack of participation in a conspiracy or withdrawal from the conspiracy.

Government stated that it had previously turned over the search warrant affidavits, but would do so again during the lunch break, that it had not seen any gambling receipts or fake pay stubs in the documents recovered from the searches, and that, if Defendant wanted to see the miscellaneous documents recovered during the searches of the residences, none of which the Government believed to be relevant, it would also show him those documents immediately.  (*Id.* at 63-64, 67).

The Government rested its case-in-chief on the afternoon of Friday, August 21, and on Monday, August 24, 2020, Rinaldi called Kaluzny as a witness to the stand.  At that time, despite the Government having provided Rinaldi with a copy of the search warrant affidavits and having provided for Rinaldi's review the other "miscellaneous" documents on Friday, Rinaldi only questioned Kaluzny as to the "Christopher Peterson - Jencks Addendum" (Def. Ex. 15) which had been officially provided to him on August 19, 2020 (*see* Trial Tr., Aug. 19, 2020, at 128) as well as the distance between "Allentown" and "Kuhnsville", two cities in Pennsylvania.  (Trial Tr., Aug. 24, 2020, 3-9).  At no time did Rinaldi question Kaluzny as to any of the documents he claimed not to have received or viewed prior to August 21, or information he may have received from those documents, during his examination.  Rinaldi did not call any further witnesses in his defense.

---

(*Id*. at 19-20). This analysis is equally applicable to any "gambling receipts" or "fake pay stubs", to the extent they exist, found during the searches of the two residences.

In addition, and of key significance, the Government's assertion that it had previously turned over the search warrant affidavits for 8B Birchwood Court and 143 Blackman Street is plainly supported by the record as early as December, 2018, almost two years prior to the commencement of trial.  On December 10, 2018, Rinaldi filed a "Motion to Suppress and for a Franks Hearing" (Doc. 81).  At that time, Rinaldi argued as follows:

> First Rinaldi will address the searches of 143 Blackman Street and 8B Birchwood Court. These searches were unconstitutional cause the affidavits never established probable cause.  The Affiant stated that no sales were made from or near the vicinity of these addresses and there was nothing establishing a nexus between these residences and Rinaldi['s] alleged drug operation.

(*Id*. at 1-2). This argument in support of Rinaldi's pre-trial motion is clearly premised on his having seen and reviewed the search warrant affidavits for the two residences prior to the filing of his motion on December 10, 2018.  Rinaldi could not assert that these affidavits did not establish probable cause without having first read the affidavits.  Nor could Rinaldi set forth what the affiant stated without having actually read the search warrant affidavits for the residences.

Here, there is no evidence, or indication, that any of Kaluzny's "prior statements" which Rinaldi claims he did not receive or the "miscellaneous" documents which Rinaldi asserts were not timely provided by the Government were actually relevant to the case, exculpatory to him, would have aided him in his defense or altered his defense in any way,

or that the absence, if any, of one or more of these documents at an earlier time otherwise caused him to suffer any prejudice.[22]

In sum, the Court finds no support for Rinaldi's assertions of error and suggestion that the cumulative effect of those alleged errors resulted in an unfair trial. After consideration of the combined effect of the claimed errors in determining whether they present a "serious danger that a miscarriage of justice has occurred", *Silveus*, 542 F.3d at 1005, the Court finds that they present no such danger, nor has Rinaldi demonstrated that he suffered prejudice as a result of the alleged errors. Thus, for the reasons set forth in this memorandum opinion, Defendant Rinaldi's motion for a new trial will be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendant Michael Rinaldi's "Motion for a New Trial" (Doc. 402) and "Motion for Judgement of Acquittal" (Doc. 403). A separate Order follows.

Robert D. Mariani
United States District Judge

---

[22] The Government further asserts in response to Defendant's motion for a new trial that Kaluzny's affidavit in support of the search warrants for the two residences "was substantially identical to the affidavit in support of the search warrant for Brown's vehicle, which yielded the kilogram of cocaine", which was undisputedly provided to Rinaldi at an earlier time. (Doc. 429, at 18). Because the search warrant affidavits for the two residences were never filed of record or presented at trial, the Court is unable to compare these documents to determine the extent of the similarities. Nonetheless, Rinaldi does not contest the Government's assertion that they were "substantially identical". Additionally, the fact that the search warrant affidavits for the two residences were never presented at trial by Rinaldi, even after he claims he first received them on August 21, 2020, further supports the Government's assertion of substantial similarity, as well as its assertion that "nothing in it [search warrant affidavit for residences] was new or unknown to Rinaldi when he cross-examined the officer [Kaluzny] the first time" (Doc. 429, at 18).